565 A.2d 340

**James Deon BRICKER**

**v.**

**STATE of Maryland.**

**No. 166, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Nov. 2, 1989.

Bradford C. Peabody, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

James Deon Bricker was convicted by a jury in the Circuit Court for Prince George's County of two counts of third degree sexual offense (counts 2 and 5) and two counts of assault and battery (counts 4 and 6). For counts 2 and 4, he was sentenced to 10 years imprisonment. For counts 5 and 6, a consecutive 10–year sentence was imposed. The sole issue on appeal is whether the trial judge erred in ruling that Dr. Edward Schultze was not a qualified expert witness who could give an opinion that Bricker was not criminally responsible for his conduct. We hold the trial judge erred and explain.

At trial, Dr. Schultze testified that he had received a bachelor's degree in behavioral and social sciences, a master's degree in psychology, a master's degree in vocational education for the handicapped, and a doctorate of education in emotional disturbance (special education). Dr. Schultze also stated that he was presently employed as the principal of the Leary School in Virginia, and had personally observed Bricker who had been a student at Leary for approximately one year prior to his arrest. Defense counsel then offered Dr. Schultze as an "expert in the area of handicapped, such as mental retardation."

After the offer, the State elicited testimony from Dr. Schultze in which he related that he was neither a practicing or licensed psychologist, nor was he a psychiatrist. The State then argued that, since Dr. Schultze was neither a psychiatrist nor a licensed psychologist, he could not give his opinion regarding Bricker's criminal responsibility at the time he committed the subject offenses. Then the following exchange took place:

"[DEFENSE COUNSEL]:

\* \* \* \* \* \*

"What you're saying is, I can't ask it based upon your opinion, was Mr. Bricker criminally responsible at the time? I was going to ask him if his mental retardation

would affect his ability to understand what he is doing and understand whether—whether Mr. Bricker understood that what he was doing was a crime.

"THE COURT: You are walking right into the definition of nonresponsibility.

"[DEFENSE COUNSEL]: But I am leaving it up to the jury. I am not asking his opinion whether Mr. Bricker was responsible at the time. I am asking him if Mr. Bricker understood, from his mental level, understood what he was doing wasn't proper at the time that he did it.

"THE COURT: It sounds like you are raising the defense of diminished capacity, which is not recognized in Maryland.

"[DEFENSE COUNSEL]: But I am not. I am going to argue to the jury insanity.

"THE COURT: How are you going to argue insanity if you don't have any expert saying that he was insane at the time? Don't you have to have some medical expert get up here and say that he was not responsible because at the time he could not appreciate the criminality of his actions and conform his conduct to the level of the law?

"[DEFENSE COUNSEL]: What we are dealing with is mental retardation here as opposed to your straight old-fashion insanity, mental disorder. That is what we are talking about. Not criminally responsible."

After a recess, the trial judge ruled:

"All right, I will tell you what the game plan is going to be. I will let this gentleman testify. I don't believe, even as he testifies to the mental retardation of the defendant, that that testimony is sufficient to raise the issue of not criminally responsible.

"In other words, it's not probative on that issue and therefore, I could not let that issue go to the jury.

"[DEFENSE COUNSEL]: Right."

The trial judge then permitted Dr. Schultze to testify *out of the presence of the jury.*

Based on his personal observations and the records he reviewed, Dr. Schultze testified that Bricker's degree of retardation ran from a mild to a moderate range of retardation.[1] He also stated that Bricker's ability to determine right from wrong was questionable since he often acted without regard to the consequences of his actions. Dr. Schultze concluded that Bricker's degree of mental retardation rendered him unable to understand the criminality of his act. Dr. Schultze was not permitted to testify at all in the presence of the jury and consequently, no evidence was submitted as to Bricker's mental state. Later, the trial judge instructed the jury that, since no evidence was presented that Bricker was not criminally responsible, this was not an issue for the jury to determine.

## EXPERT TESTIMONY

Appellant contends that Dr. Schultze should have been permitted to testify as an expert regarding appellant's capacity to appreciate the criminality of his acts. Appellant posits that Dr. Schultze's specialized educational background and personal knowledge of appellant's mental capabilities qualified Dr. Schultze to give an opinion whether appellant was responsible for his criminal conduct. The State argues that under *State v. Conn*, 286 Md. 406, 425, 408 A.2d 700 (1979), Dr. Schultze could not be questioned regarding whether, in his opinion, appellant was responsible for his criminal conduct, as that is a medical question. Under *Conn*, the State argues, only a medically trained psychiatrist can testify on the ultimate issue. In addition to medically trained psychiatrists, the State correctly points out that licensed psychologists are also permitted to testify regarding the ultimate issue of whether the accused is criminally responsible. Md. Cts. & Jud.Proc.Code Ann. § 9–120 (1974, 1984 Repl.Vol.).[2]

---

1. Although Dr. Schultze did not personally administer the tests, he based his conclusion on a series of Wexler tests conducted on Bricker.

2. Section 9–120 provides:

Appellant counters, however, that *Conn* did not apply to the mentally retarded since the statute in effect at that time made no reference to mental retardation in the test for criminal responsibility.[3] Appellant maintains that, since "mental retardation" was specifically excluded from the definition of "mental disorder" in the 1972 amendments, the opinion required by a medically trained psychiatrist set forth in *Conn* applied only to an individual with a "mental disorder." Thus, appellant concludes that the 1982 amendment, which added "mental retardation" to the test for criminal responsibility, broadened the class of experts whose testimony is admissible on this issue, because mental retardation is not strictly a "medical question." We do agree with appellant that at the time *Conn* was decided "mental disorder" did not include "mental retardation" in the statutory test for criminal responsibility. We explain.

Prior to 1972, "mental disorder" was defined as a "[m]ental illness *or mental retardation* or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder." Md.Code Ann. Art. 59, § 3(f) (1957, 1968 Repl.Vol., 1970 Cum.Supp.) (emphasis added). In *Johnson v. State*, 292 Md. 405, 426–27, 439 A.2d 542 (1982), the Court of Appeals noted:

"Notwithstanding any other provision of law, a psychologist licensed under the 'Maryland Psychologists Act' and qualified as an expert witness may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge, in any case in any court or in any administrative hearing."

3. Maryland Code Ann. Art. 59, § 25 (1957, 1972 Repl.Vol.), provided in pertinent part:

"(a) A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct *as a result of mental disorder*, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms 'mental disorder' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (Emphasis added.)

"In 1972, the term 'mental retardation' was deleted from the section 3(f) definition of 'mental disorder' and the definition was made to expressly preclude mental retardation. 1972 Md. Laws, ch. 345; Md. Code (1957, 1979 Repl.Vol.), Art. 59, § 3(f). Because at common law, mental retardation alone was not generally considered sufficient to support the defense of insanity, it appeared that the foregoing amendments precluded the insanity defense based on that mental condition. When, in 1978 the Attorney General of this State expressed the view that, in light of these statutory changes, 'the Legislature intended that the defense of insanity based upon mental retardation would be unavailable to defendants in the future.' 63 Op.Md.Att'y.Gen. 230, 235 (1978), the General Assembly, in response, redefined 'mental disorder,' as expressed in Code (1957, 1979 Repl.Vol., 1981 Cum.Supp.), Art. 59, § 3(f), '[for] the purpose of including mental retardation in the definition of mental disorder' when that term is used to define insanity as a defense in criminal cases. 1980 Md. Laws, ch. 823. Thus, by readjusting the concept of criminal insanity to include mentally retarded defendants, the legislature has made manifest that any such mentally deficient persons having met the section 25(a) definition of insanity are not to be held accountable for behavior in breach of societal norms as those precepts are expressed in the criminal law." (Brackets in original.) (Footnote omitted.) (Some citations omitted.)

Article 59 was later repealed, however, and § 25(a) was replaced by Md. Health–Gen.Code Ann. § 12–107 (1982), 1982 Md. Laws ch. 21.[4] "Rather than define 'mental disor-

---

4. Now codified in Md. Health–Gen. Code Ann. § 12–108 (1982, 1989 Cum.Supp.), which provides:

"(a) **Test—In general.**—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

"(1) To appreciate the criminality of that conduct; or

"(2) To conform that conduct to the requirements of law.

der' in a manner that contradicts the usual definition of the term ... specific reference to 'mental retardation' " was added to the test for criminal responsibility in 1982. Md. Health–Gen.Code Ann. § 12–101(f) (1982), Special Revisor's Note. As a result of these statutory changes, it is evident that mental retardation was not included in the statutory test for criminal responsibility when *Conn* was decided. Thus, *Conn* is not necessarily controlling where we are dealing with an individual suffering from mental retardation.

■ Appellant posits that the inclusion of the words "mental retardation" constitutes the basis for broadening the class of experts whose testimony is admissible on the issue of criminal responsibility. We agree with appellant's position, but only to the extent of broadening the class of experts in an exceptional case where a witness, who by reason of an exceptionally wide experience and/or association with the accused, is qualified to testify regarding mental retardation on the same basis as a psychiatrist or a licensed psychologist. This is particularly so where the proffered testimony is sought from the witness as both a fact witness and an expert. In order to determine whether Dr. Schultze is within that exception, we must first examine the principles relating to the admissibility of expert testimony.

In *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988), the Court of Appeals set forth the findings the trial court must make when ruling on the admissibility of expert testimony. Initially, the trial judge must determine whether the proffered evidence is a proper subject for expert testimony. The test is "whether the jury will receive appreciable help from the expert testimony in resolving the issues presented in the case." *Simmons*, 313 Md. at 41, 542 A.2d 1258. The issue in the instant case involves the statutory

---

"(b) **Same—Exclusion.**—For purposes of this section, 'mental disorder' does not include an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct."

test of criminal responsibility. This test is predicated upon "mental disorder or mental retardation" and thus requires an assessment of the defendant's mental status. This involves an examination of the defendant to reconstruct his or her behavior and mental status at the time of the offense.

Based upon this examination and testing, the expert must then determine whether a causal connection exists between the defendant's past or present mental condition and his or her criminal conduct. This determination is clearly a subject on which the fact finder can receive appreciable help from an expert.

Once the trial judge determines that the proffered evidence is a proper subject for expert testimony, the trial judge must next determine whether the proposed expert is qualified to testify by virtue of education and experience. *Simmons*, 313 Md. at 41, 542 A.2d 1258. Under *Conn*, a medically trained psychiatrist will generally qualify as an expert on mental disorders. By statute, a licensed psychologist is also permitted to testify.[5] The issue here, however, is whether an unlicensed psychologist is qualified to testify regarding the existence of mental retardation and whether there is a causal relationship between the mental retardation and the crime committed.

Our research into Maryland case law and that of our sister jurisdictions failed to reveal any cases which have addressed the precise issue presented in the instant case. As a starting point, we did, however, find that the majority of jurisdictions permit a properly qualified psychologist to testify on issues concerning mental condition. *See* Annotation, *Qualification of Nonmedical Psychologist to Testify as to Mental Condition or Competency*, 78 ALR 2d 919 (1961) & supplement thereto in ALR 2d Later Case Service 407 (1986); 3 C. Torcia, *Wharton's Criminal Evidence* § 551 (14th ed. 1987).

---

**5.** *See* n. 2.

The basic principle that we glean from the cases is that as a general rule the qualification of a psychologist as an expert will depend in each case upon the extent of the particular psychologist's education, training and experience, rather than a rule which fixes the qualifications to some degree or title. As pointed out in *Jenkins v. United States,* 113 U.S.App.D.C. 300, 307 F.2d 637 (1962) (en banc),

> "[t]he determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge. It does not depend upon his claim to the title 'psychologist.' "

*Jenkins,* 307 F.2d at 645. Instead, "[t]he critical factor in respect to admissibility is the actual experience of the witness and the probable probative value of his opinion." *Jenkins,* 307 F.2d at 646. In his concurring opinion, Justice Burger emphasized that "many factors other than academic degrees go to the admissibility and weight of the expert testimony." *Jenkins,* 307 F.2d at 650. *See, e.g., United States v. Gilliss,* 645 F.2d 1269, 1278 (8th Cir.1981); *United States v. Portis,* 542 F.2d 414, 419 (7th Cir.1976); *United States v. Riggleman,* 411 F.2d 1190, 1191 (4th Cir.1969); *Hidden v. Mutual Life Ins. Co. of New York,* 217 F.2d 818, 821 (4th Cir.1954); *United States v. Tesfa,* 404 F.Supp. 1259, 1273 (E.D.Pa.1975), *aff'd,* 544 F.2d 138 (3rd Cir.1976), *cert denied,* 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977); *United States v. Green,* 373 F.Supp. 149, 158 (E.D. Pa.1974), *aff'd,* 505 F.2d 731 (3d Cir.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *Commonwealth v. Monico,* 396 Mass. 793, 488 N.E.2d 1168, 1176 (1986); *State v. Robertson,* 108 R.I. 656, 278 A.2d 842, 845 (1971); *Rollins v. Commonwealth,* 207 Va. 575, 151 S.E.2d 622, 626 (1966), *cert. denied,* 386 U.S. 1026, 87 S.Ct. 1387, 18 L.Ed.2d 469 (1967).

Our concern here is the effect of the lack of a license on the admissibility of a psychologist's opinion on mental retardation. As indicated in *Conn,* only a psychiatrist or li-

censed psychologist under § 9–120 was permitted to testify regarding mental disorders and their effect on criminal responsibility. This was so because the expert was attempting to reconstruct the condition of the mind of the defendant as of the date of the crime. *Conn,* 286 Md. at 428, 408 A.2d 700.

We point out, however, that at the time § 9–120 was enacted and *Conn* was decided, mental retardation was not included in the statutory test for criminal responsibility. Thus, the intent underlying § 9–120 and the decision in *Conn* was to permit psychiatrists and licensed psychologists to testify on mental disorders. Neither addressed nor were they intended to address mental retardation.

Under the present test of § 12–108, mental disorders and mental retardation are conditions which excuse criminal responsibility. Mental retardation, however, is a condition conceptually distinct from mental disorders and thus, under certain circumstances, an individual other than a psychiatrist or licensed psychologist could qualify as an expert on mental retardation. We explain.

Mental retardation is an impairment in learning capacity which ordinarily originates in the developmental period and is often present at birth.[6] It tends to persist in a stable form from its onset throughout adult life. Mental retardation is divided, on the basis of severity, into four psychological classes, each reflecting the degree of intellectual impairment. A mild case is marked by an intelligence quotient

---

6. Mental retardation is not defined under Title 12 of the Health–Gen. Art. (1982, 1989 Cum.Supp.), dealing with incompetency and criminal responsibility and, furthermore, it is expressly excluded from the definition of mental disorder. § 12–101(f)(3). Instead, mental retardation is defined under Title 7 of the Health–Gen. Art. (1982, 1989 Cum.Supp.), dealing with developmental disabilities. Under that definition, the essential features of mental retardation are significant subaverage intellectual functioning and significant impairments in adaptive functioning which are manifested before the age of 22. § 7–101(1) & § 7–101(e)(2). Unlike some mental disorders which are transient dysfunctions of the brain, mental retardation is likely to continue indefinitely from the onset of the disorder. *See* § 7–101(e)(3).

(IQ) of 50–55 to approximately 70; a moderate case, 35–40 to 50–55; a severe case, 20–25 to 35–40; and a profound case, below 20 or 25. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, pp. 28–32 (3d ed. rev. 1987) (DSM–III–R). Moreover, unlike mental disorders which are primarily within the sole ken of the specially and highly trained, mental retardation is generally understood by laymen.

In contrast, "mental disorder" is defined as "behavioral or emotional illness that results from a psychiatric or neurological disorder." Md. Health–Gen.Code Ann. § 12–101(f)(1) (1982, 1989 Cum.Supp.). It may have an organic basis or may be functional. Organic mental disorders are transient or permanent dysfunctions of the brain which result in a wide variety of different emotional, motivational and behavioral abnormalities. DSM–III–R p. 98. The functional psychoses disorders are usually manifested by bizarre behavior, delusions, hallucinations, thought disorganizations and rapid shifts of emotional state. DSM–III–R pp. 187–203.

Mental disorders may occur at any age and onset may be sudden or may be insidious. It is often impossible to determine whether the symptoms are the direct result of damage to the brain or are a reaction to cognitive deficits or other psychological changes. DSM–III–R pp. 187–203. Thus, a more detailed evaluation of numerous symptoms is necessary to diagnose the disordered thinking or distorted perceptions of mental disorders in comparison to mental retardation which typically is diagnosed by measurable intelligence levels. Moreover, mental retardation is primarily an educational problem; it is not a disease which can be cured through drugs or treatment, although with proper habilitation, the level of functioning of a mentally retarded person may improve. *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295, 1298 (E.D.Pa.1977), *aff'd in part, rev'd in part*, 612 F.2d 84 (3d Cir.1979), *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), *on remand*, 673 F.2d 647 (3d Cir.1982), *rev'd*,

465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (reform of Pennsylvania mental health system).

This is significant for our discussion of criminal responsibility because, once mental retardation is established, the sole determination is whether the mental retardation so affected the individual that he or she lacked the capacity to understand the consequences of his or her acts.

■ In comparison, a determination of criminal responsibility of an individual with a mental disorder involves a more complicated analysis. Once it is established that an individual has a transient mental disorder, it next must be determined whether the individual was affected by the disorder at the time of the crime and, if so, whether the disorder affected the individual's capacity to understand the criminality of his or her act. Arguably, it would be easier to show that a mentally retarded person lacked the capacity for appreciation because of his or her low intelligence. Menninger, *Mental Retardation and Criminal Responsibility: Some Thoughts on the Idiocy Defense*, 8 Int'l J.L. & Psychiatry 343, 349 (1986). Based on these differences, we believe that an unlicensed psychologist who has worked with and observed a mentally retarded individual may well be qualified to render an expert opinion on that person's criminal responsibility.

■ We hesitate to establish a rigid rule that would automatically disqualify a psychologist from giving an opinion on mental retardation. The absence of a license, in and of itself, does not detract from one's competency.

> "There is no magic in particular titles or degrees and, in our age of intense scientific specialization we might deny ourselves the use of the best knowledge available by a rule that would immutably fix the educational qualifications to a particular degree."

*People v. Hawthorne*, 293 Mich. 15, 291 N.W. 205, 209 (1940) (Butzel, J. concurring). The fact that a psychologist is not licensed goes to the weight of his or her testimony, not to its admissibility. *See State v. Walker*, 58 Or.App.

607, 649 P.2d 624, 625 (1982). Accordingly, we hold that the lack of a license will not automatically disqualify a psychologist from rendering an expert opinion on criminal responsibility where mental retardation is at issue.

■ The better rule is that a psychologist's competence to give an opinion on mental retardation will depend in each case upon the extent of the particular psychologist's education, training, and experience. In order to accomplish this, the trial judge should ascertain the extent of the individual's qualifications and, if the subject matter falls within that person's experience or knowledge, permit him or her to testify within that range. But such testimony should be received with caution and only after the trial judge is completely satisfied that the witness is competent to testify regarding the criminal responsibility of the defendant. Thus, when someone other than a medical doctor or a licensed psychologist is offered as an expert witness on the subject of mental retardation, the trial judge should take greater precaution in the preliminary inquiry to determine the extent of that witness's qualifications, more so than might otherwise be necessary. *See State v. Padilla,* 66 N.M. 289, 347 P.2d 312, 319 (1959).

As a final consideration, in admitting evidence, "the proposed expert testimony must be competent; that is, the expert's conclusions must be based upon a legally sufficient factual foundation." *Simmons,* 313 Md. at 41–42, 542 A.2d 1258. In *Bohnert v. State,* 312 Md. 266, 274–75, 539 A.2d 657 (1988), quoting *State Department of Health v. Walker,* 238 Md. 512, 520, 209 A.2d 555 (1965), the Court of Appeals said:

> " 'An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative

force unless a sufficient factual basis to support a rational conclusion is shown. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess.' '' (Citations omitted.)

In the instant case, the record reveals that Dr. Schultze is not a licensed psychologist.[7] He has a bachelor's degree in behavioral and social sciences, a master's degree in psychology, another master's degree in vocational education for the handicapped, and a doctorate in special education. Dr. Schultze has been employed as the principal of the Leary School in Virginia for the past 11½ years, a school for mentally handicapped children. Prior to that, he worked as a teacher in the Virginia Department of Corrections for over one year. Dr. Schultze testified that he specializes in working with mentally retarded students with emotional problems at Leary School. For one year prior to the subject incident, Dr. Schultze worked with appellant while he was a student at Leary School. Thus, Dr. Schultze's personal observations of appellant during the one year prior to trial provided an ideal factual foundation since the testimony was from "first-hand knowledge." *Simmons*, 313 Md. at 42, 542 A.2d 1258.

When defense counsel proffered Dr. Schultze as an expert in the field of mental retardation, the trial judge rejected him on the basis of *Conn* and § 9–120, *i.e.*, he was not qualified to give an opinion on mental disorders. In view of the preceding discussion, the trial judge used the wrong test. Instead, the qualification of an unlicensed psychologist as an expert in the field of mental retardation

---

7. In the instant case, Dr. Schultze is not required to have a license as a condition of his employment.

will depend upon the extent of the particular psychologist's education, training and experience.

We find it necessary to add to this test that this determination is for the trial judge to decide as a preliminary matter of law. *Trimble v. State*, 300 Md. 387, 404, 478 A.2d 1143 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985). The trial judge is given broad discretion in making this determination but may be reversed if founded on an error of law, an evidentiary error, or if the trial judge clearly abused his or her discretion. *Stebbing v. State*, 299 Md. 331, 350, 473 A.2d 903, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Thus, we reverse and remand the case for a new trial. If Dr. Schultze is again offered as a witness, the trial judge must determine whether Dr. Schultze's psychological knowledge, his understanding of mental retardation and his familiarity with appellant are sufficient to qualify him to testify as an expert in the field of mental retardation.

JUDGMENTS REVERSED. CASE REMANDED FOR A NEW TRIAL.

COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.